**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

─────────

No. 15-2863

─────────

SALEEM BEY,

Appellant

v.

SUPERINTENDENT GREENE SCI;
THE DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA;
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA

─────────

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-13-cv-05848)
District Judge: Honorable Anita B. Brody

─────────

Argued November 8, 2016

(Filed: May 10, 2017)

Before: McKEE and RESTREPO, *Circuit Judges*; HORNAK,
*District Judge*.[*]

Michael Wiseman, Esq.                    **[ARGUED]**

───────────────

[*] Honorable Mark R. Hornak, District Judge for the
United States District Court for the Western District of
Pennsylvania, sitting by designation.

P.O. Box 120
Swarthmore, PA 19081
        *Attorney for Appellant*

John W. Goldsborough, Esq.                    **[ARGUED]**
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
        *Attorney for Appellees*

_____

OPINION OF THE COURT

_____

McKEE, *Circuit Judge*.

Saleem Bey appeals the order of the District Court dismissing the habeas corpus petition he filed pursuant to 28 U.S.C. § 2254. He contends that his trial counsel rendered ineffective assistance for failing to object to: (1) a faulty jury instruction on eyewitness testimony (*Kloiber* instruction); and (2) the prosecution's comments on his post-*Miranda* silence. Bey concedes that his claims are procedurally defaulted, but argues his default should be excused because his post-conviction review counsel's assistance was ineffective when he failed to raise the claims in collateral proceedings. For the following reasons, we conclude there is cause to excuse Bey's procedural default for his ineffective assistance of counsel claim pertaining to the *Kloiber* instruction. We will vacate the District Court's order and remand for issuance of a conditional writ based on that claim. Accordingly, we need not reach Bey's claim pertaining to the prosecution's comments on his post-*Miranda* silence.

I

Bey was charged with the nonfatal shooting of Kenneth Thompkins and the fatal shooting of Terry Swanson that took place on November 21, 2001 in a club parking lot in Philadelphia. Bey's first trial ended in a hung jury. On retrial, Bey was convicted of murder, attempted murder, and

2

possessing an instrument of crime. He was sentenced to life in prison for murder, 7.5 to 40 years for attempted murder, and 9 to 18 months for the weapons offense.

The prosecution's key witness at the retrial was Philadelphia Police Officer Daniel Taylor. Taylor testified that he saw Bey running from the direction of the first gunshots in the south end of the parking lot and that Bey shot Thompkins from behind with a silver handgun as he ran. Taylor said that he then saw Thompkins fall to the ground as Bey continued running north toward Taylor. According to Taylor, Bey tucked the handgun into his waistband as he ran. Taylor testified that when Bey was about fifteen feet away from him, Taylor shouted "police, drop the gun" and Bey looked up in response.[1] Taylor then made "eye-to-eye" contact with Bey as Bey "looked right at [Taylor's] face."[2] Taylor then gave chase with several other officers, and Bey was arrested moments later. No weapons were found on Bey, though a .380 silver gun—which matched the bullet casings at the scene—and a black and silver Derringer handgun were found elsewhere in the parking lot. Officer Ferrero testified that he saw Bey drop the Derringer as he ran from police.

Taylor's identification of Bey as the shooter was certain and unequivocal. Taylor said he could see Bey clearly: There were no cars or people obstructing his view, and the area was "well lit."[3] Taylor's identification of Bey as the shooter was consistent in all of Taylor's interviews, preliminary hearings, at the initial trial, and at the retrial that occurred after the first jury was unable to reach a verdict. However, Taylor was the only eyewitness who identified Bey as the shooter. Other officers on the scene at the time of the shooting testified that they understood Bey to be the shooter because Taylor identified him as such. Kenneth Thompkins, the surviving victim, testified that he did not see his shooter. However, in statements to Bey's then-defense counsel,

---

[1] J.A. at 172.
[2] J.A. at 173.
[3] J.A. at 195.

Thompkins had said that his shooter was not Bey, but a bald, dark-skinned, bearded man.

During the retrial, defense counsel requested a special jury instruction on eyewitness testimony, pursuant to the Pennsylvania Supreme Court's decision in *Commonwealth v. Kloiber*.[4] In *Kloiber*, the Pennsylvania Supreme Court recognized the need for a cautionary instruction in certain eyewitness cases.[5] The trial judge here did attempt a *Kloiber* charge. However, rather than giving the charge outlined in *Kloiber*, the court instructed the jury as follows:

> Where a witness is positive of his identification, such as where the opportunity for positive identification is good and the witness is positive in his identification and the identification has not been weakened by any prior failure to identify but remains even after cross-examination positive and unqualified, the testimony as to the identification **may not be received with caution**. Indeed, positive testimony as to identity may be treated as a statement of fact.
>
> On the other hand, if you believe that a witness is not in a position to clearly observe and was not in a position because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person actually had the opportunity to observe that which he testified to and a positive identification of a defendant by one witness is sufficient for a conviction.[6]

Although the bold text in the quoted instruction is critically inconsistent with *Kloiber*, defense counsel did not object. In

---

[4] 106 A.2d 820 (Pa. 1954).

[5] *Id.*

[6] J.A. at 1027 (emphasis added).

*Kloiber*, the Pennsylvania Supreme Court had actually stated the following:

> Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification **need not be received with caution**—indeed the cases say that "his [positive] testimony as to identity may be treated as the statement of a fact." For example, a positive, unqualified identification of defendant by one witness is sufficient for conviction even though half a dozen witnesses testify to an alibi.
>
> On the other hand, where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.[7]

The difference between telling jurors that they "may not" receive an identification with caution and instructing them that they "need not" receive the identification with caution is the difference between telling jurors that they *must* accept an identification and telling them that they *may* accept the testimony without reservation, but they need not do so.

---

[7] *Kloiber*, 106 A.2d at 826–27 (citations omitted) (emphasis added).

5

The confusion sewn by this instruction was soon evident. During deliberations, the jury asked the court to clarify aspects of Officer Taylor's testimony. The jury asked the court: "[M]ay we have or hear the transcript of Officer Taylor's testimony describing from the time the officer heard the first shot to when the defendant ran west towards the wall?" and "May we also have [the] statement where Officer Taylor says he saw the defendant shoot Swanson?"[8] Both questions went unanswered.

The jury ultimately convicted Bey of the murder of Terry Swanson, attempted murder of Kenneth Thompkins, and possessing an instrument of crime. Thereafter, Bey filed a petition for post-conviction relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA").[9] His appointed PCRA counsel raised an ineffective assistance of counsel claim based on the *Kloiber* instruction, but failed to highlight the "may not be received with caution" language. Instead, Bey's PCRA counsel challenged three other aspects of the instruction. Counsel argued the instruction: (1) failed to inform jurors that if they found circumstances casting doubt on the identification's accuracy, the testimony "must be received with caution," thereby omitting language from *Kloiber*;[10] (2) impermissibly placed a burden on the defense to prove circumstances casting doubt on the accuracy of the identification; and (3) improperly instructed jurors that "positive testimony as to identity may be treated as a statement of fact."[11]

The PCRA Court considered only the third of the *Kloiber* issues raised in the petition, holding that the "statement of fact" language was permissible under state law and as a result, trial counsel's assistance was not ineffective

---

[8] J.A. at 1041, 1048.

[9] 42 Pa. Const. Stat. § 9541, *et seq.*

[10] 106 A.2d at 826.

[11] J.A. at 62–64.

for failing to object to the instruction.[12] The Court thus denied the PCRA petition, and the Pennsylvania Superior Court thereafter affirmed the PCRA court's conclusions.[13] Bey sought leave to appeal to the Pennsylvania Supreme Court but that request was declined.[14]

Bey then filed this petition for habeas corpus relief, alleging, among other things, that his Sixth Amendment right to counsel was violated by his trial counsel's failure to object to the "may not be received with caution" language of the *Kloiber* instruction. Bey also argues that his PCRA counsel's failure to raise his ineffective assistance of trial counsel claim on collateral review amounted to a Sixth Amendment violation that excuses any procedural default at the PCRA appeal level.

The District Court adopted the Magistrate Judge's recommendation that Bey's claims be rejected.[15] The District Court held generally that to the extent that Bey's ineffective assistance claims were not procedurally defaulted, Bey could not show prejudice because "there was overwhelming evidence of guilt."[16] We thereafter certified the following two issues for appeal: (1) Whether Bey's trial attorney's assistance was ineffective for failing to object to a faulty *Kloiber* instruction and whether any procedural default of this issue should be excused; (2) Whether Bey's trial attorney rendered ineffective assistance in failing to object on proper grounds to the prosecutor's comments on Bey's post-arrest, post-*Miranda* silence and whether the procedural default of that issue should be excused. As we noted at the outset, since

---

[12] *Commonwealth v. Bey*, Nos. CP-51-CR-1206691-2001, CP-51-CR-1209051-2001, slip op. at 4, 11–12 (Phila. Ct. Com. Pl. July 26, 2011).

[13] *Id.* at 2; *Commonwealth v. Bey*, 53 A.3d 922 (Pa. Super. Ct. 2012) (unpublished table decision).

[14] *Commonwealth v. Bey*, 67 A.3d 792 (Pa. 2013).

[15] *Bey v. Folino*, No. CIV.A. 13-5848, 2015 WL 4130358, at *1 (E.D. Pa. July 9, 2015).

[16] *Id.* at *1 n.1.

we are granting relief on the *Kloiber* ineffectiveness claim, we do not reach Bey's claim based on the prosecution's closing argument.[17]

## II

"The doctrine of procedural default prohibits federal courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment."[18] Bey concedes that both of his ineffective assistance of counsel claims are procedurally defaulted. However, a habeas petitioner's procedural default may be excused if the petitioner can show cause for the default and prejudice arising from failure to consider the claim.[19] If cause and prejudice are shown and the default excused, our review of a petitioner's claim is *de novo* because the state court did not consider the claim on the merits.[20] On the other hand, if a constitutional claim is properly raised in state court—and therefore, not procedurally defaulted—the state court's determination is afforded

---

[17] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have appellate jurisdiction to review the certified issues under 28 U.S.C. § 2253.

[18] *Fahy v. Horn*, 516 F.3d 169, 187 (3d Cir. 2008). A state procedural rule is "independent" if it is not interwoven with federal law or dependent upon a federal constitutional ruling. *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983). A state procedural rule is "adequate" if it was "firmly established and regularly followed" at the time of the alleged procedural default. *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

[19] *United States v. Frady*, 456 U.S. 152, 167–68 (1982).

[20] *Bronshtein v. Horn*, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005).

substantial deference under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").[21]

A

We must first determine if Bey's claim is procedurally defaulted. Procedural default occurs when "the prisoner ha[s] failed to meet a state law procedural requirement."[22] Pennsylvania's procedural rules state that a defendant waives an ineffective assistance of counsel claim unless he or she raises it during the first state collateral review proceeding.[23]

Bey concedes that his PCRA counsel failed to argue that his trial counsel's assistance was ineffective in failing to object to the *Kloiber* instruction that the jury "may not . . . receive[] with caution" positive eyewitness testimony. Bey therefore acknowledges that his claim is procedurally defaulted. Nevertheless, he argues that the default should be excused. In rejecting that position, the District Court reasoned that because the PCRA petition generally raised

---

[21] Under AEDPA, federal courts may grant habeas relief only if a state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

[22] *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

[23] *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002) ("[A]ny ineffectiveness claim will be waived only after a petitioner has had the opportunity to raise that claim on collateral review and has failed to avail himself of that opportunity."). *See also* 42 Pa. Cons. Stat. § 9545(b) (PCRA petitioners are time-barred from raising claims after one year of the final judgment). We have held that this state procedural rule is independent of the federal question and adequate to support the judgment. *Glenn v. Wynder*, 743 F.3d 402, 409 (3d Cir. 2014).

9

ineffectiveness claims based on issues with the *Kloiber* charge, Bey's counsel did raise this claim to state courts.[24] Accordingly, the Court applied deferential AEDPA review and held that the state courts reasonably rejected the *Kloiber* ineffectiveness claim and Bey was therefore not entitled to habeas relief.[25]

Bey's PCRA petition did claim ineffective assistance of counsel based on a faulty *Kloiber* instruction, and argued that as a basis for the objection under the state and federal constitutions. But none of the three *Kloiber* issues raised in the petition pertain to the claim Bey is raising here or the language it is based on. As noted above, the current objection challenges the trial court's instruction that positive and unqualified eyewitness testimony "may not be received with caution."[26] Though Bey's petition and the PCRA Court's opinion reprint the problematic phrase, Bey's counsel made no argument about it, and the court did not consider that language in adjudicating Bey's PCRA claim.[27] Accordingly, we conclude that the specific ineffective assistance claim addressing the trial court's instruction that the jury "may not . . . receive[]" positive identification testimony with caution was not raised in state court and was therefore waived under state law. Consequently, Bey's claim is procedurally defaulted and we may only review it if the default can be excused. [28]

---

[24] *Bey*, 2015 WL 4130358, at *15 n.4.

[25] *Id.* at *15–16.

[26] As outlined above, the PCRA petition raises only the following issues: (1) the instruction failed to inform jurors that if a factor was present that cast doubt on the accuracy of the eyewitness's perception, then the testimony "must be received with caution" (omitting language from *Kloiber*) (2) the instruction improperly placed the burden on the defense to prove the presence of those factors, and (3) the instruction improperly told jurors that positive identification "may be treated as a statement of fact." J.A. at 60–65.

[27] *Bey*, slip op. at 11–12.

[28] *Frady*, 456 U.S. at 167–68.

10

B

Pursuant to the Supreme Court's decision in *Martinez v. Ryan*,[29] counsel's failure to raise an ineffective assistance claim on collateral review may excuse a procedural default if: "(1) collateral attack counsel's failure itself constituted ineffective assistance of counsel under *Strickland*, and (2) the underlying ineffective assistance claim is 'a substantial one.'"[30] Because Bey's claim that his PCRA counsel's assistance was ineffective stems from the strength of his underlying ineffective assistance of trial counsel claim, we consider the second *Martinez* requirement first.

To satisfy the second *Martinez* requirement, the petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one."[31] In other words, "the [petitioner] must demonstrate that the claim has some merit."[32] In *Martinez*, the Court relied upon *Miller–El v. Cockerell*,[33] suggesting that we apply the standard for issuing certificates of appealabililty in resolving the inquiry into what constitutes a "substantial" claim.[34] Thus, whether a claim is "substantial" is a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims."[35] With this framework as our guide, we can now turn to an analysis of Bey's ineffective assistance of counsel claim.

To prove ineffective assistance of counsel under *Strickland v. Washington*,[36] a petitioner must prove "(1) that his counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that

---

[29] 566 U.S. 1 (2012).
[30] *Glenn*, 743 F.3d at 409–10 (quoting *Martinez*, 566 U.S. at 14).
[31] *Martinez*, 566 U.S. at 14.
[32] *Id.*
[33] 537 U.S. 322 (2003).
[34] *Martinez*, 566 U.S. at 14.
[35] *Miller–El*, 537 U.S. at 327, 336.
[36] 466 U.S. 668 (1984).

11

counsel's deficient performance prejudiced his client,"[37] *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[38] We have previously referred to these as the "performance" and "prejudice" prongs of the *Strickland* test.[39]

Generally, trial counsel's stewardship is constitutionally deficient if he or she "neglect[s] to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority" unless the failure is a strategic choice.[40] As noted above, Bey's trial counsel failed to object to a *Kloiber* charge that blatantly misstated the wording in *Kloiber* itself. A proper charge under *Kloiber* informs the jury that it has the ultimate discretion of deciding whether to credit positive eyewitness testimony.[41] Instead, the trial court's instruction essentially required the jury to accept positive eyewitness testimony as true by directing that "testimony as to the identification **may not** be received with caution."[42] The fact

---

[37] *Albrecht*, 485 F.3d 103, 127 (3d Cir. 2007) (citing *Strickland*, 466 U.S. at 689–92).

[38] *Strickland*, 466 U.S. at 694.

[39] *See, e.g.*, *Glenn*, 743 F.3d at 409.

[40] *Everett v. Beard*, 290 F.3d 500, 514 (3d Cir. 2002). *See also Whitney v. Horn*, 280 F.3d 240, 258 (3d Cir. 2002) ("Given our discussion of the nature of the defect in this charge, and the problems that arise from it, it follows *a fortiori* that unless counsel had a strategic reason for not objecting, [the petitioner] will satisfy the first prong of *Strickland*.")

[41] *Kloiber*, 106 A.2d at 826 ("Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification **need not** be received with caution . . . ." (emphasis added)).

[42] J.A. at 1047 (emphasis added). In a footnote, the Appellees argue that because the transcript of the trial was

12

that the jurors were told that they only had to accept the identification if it was made under favorable circumstances and was not equivocal does not negate the fact that the jury did not know that it was free to reject Officer Taylor's identification even if Taylor was positive as to his identification. The instruction is likewise contrary to Pennsylvania's Suggested Jury Instruction that was based on *Kloiber*. The edition of the suggested instruction available at the time of Bey's trial directs the jury to weigh positive eyewitness testimony as follows: "you need not receive the testimony with caution; you may treat it like ordinary testimony."[43]

Although *Kloiber* and its progeny did not specifically prohibit the instruction given here at the time of Bey's retrial,[44] the trial court's deviation from the language in

---

riddled with errors, it is therefore possible that the words "may not" were mis-transcribed and the judge did instruct the jury that they "need not" receive the testimony with caution. Appellees' Br. at 36 n.13. Because Appellees have presented no evidence to support this utterly speculative claim, we need not respond to it.

[43] Pa. Bar Inst., Pa. SSJI § 4.07 (Crim.) (1st ed., rev. 1985).

[44] *Kloiber*'s requirements were not focused on identification problems when the witness had a clear view of the defendant and was consistent in his or her identification. Rather, *Kloiber* was primarily concerned with providing special instructions to caution the jury when an eyewitness did not have a clear opportunity to view a defendant, equivocated on the identification of the defendant, or had some difficulty making an identification in the past. *Kloiber*, 106 A.2d at 826–27; *Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010) ("Under *Kloiber*, 'a charge that a witness'[s] identification should be viewed with caution is required where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past.'" (quoting *Commonwealth v.*

*Kloiber* was so problematic that any alert defense counsel should have immediately known that it raised serious constitutional issues. Jurors were basically told that they had to accept the only eyewitness identification of the defendant as fact; they were not free to question it if they found Officer Taylor had a good opportunity to observe and was certain of his identification. Those are clearly relevant factors in evaluating the identification, but they were certainly no guarantee as to the accuracy of Taylor's identification of Bey.[45] The charge removed the discretion that the jury could otherwise have exercised that may have raised a reasonable doubt in the mind of one or more jurors about the identity of the shooter. Moreover, as we explain below, the instruction's deviation from *Kloiber* reaches constitutional dimensions.

A jury instruction deprives a defendant of his or her Fourteenth Amendment due process rights when it suggests a

---

*Gibson*, 688 A.2d 1152, 1163 (Pa. 1997))). Furthermore, Pennsylvania law gives trial courts broad latitude in phrasing its instructions. *Commonwealth v. Spotz*, 896 A.2d 1191, 1247 (Pa. 2006). We note, however, that after Bey's trial, *Kloiber*'s lack of concern with positive eyewitness testimony was cast into doubt by the Pennsylvania Supreme Court's decision in *Commonwealth v. Walker*, which specifically questioned "misconceptions" such as the "infallibility of eyewitness identification" and "the correlation between certainty and accuracy." 92 A.3d 766 (Pa. 2014).

[45] *See* Nat'l Research Council, Identifying the Culprit: Assessing Eyewitness Identification 15 (2014) (noting that human perception is not only susceptible to external limits such as lighting conditions but also "can be heavily influenced by bias and expectations derived from cultural facts, behavioral goals, emotions, and prior experiences with the world"); James Michael Lampinen et al., The Psychology of Eyewitness Identification 172–86 (2012) (noting that even though people generally believe that confident eyewitnesses are accurate, the degree of confidence an eyewitness possesses is malleable and even confident eyewitnesses can be mistaken).

conclusive presumption that removes the prosecution's burden of proving an element of an offense beyond a reasonable doubt.[46] If a "reasonable juror could have understood the [instruction] as a mandatory presumption that shifted to the defendant the burden of persuasion on [an] element" of the offense, the instruction is constitutionally defective.[47] However, a single jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge."[48]

Here, the prosecution was obviously required to establish that Bey—and no one else—fatally shot Swanson and wounded Thompkins. Officer Taylor's testimony that he saw Bey running from the direction of the Swanson shooting and that he saw him shoot Thompkins, if accepted, established Bey's guilt. The trial court then told the jury that positive eyewitness testimony "may not be received with caution" when "the opportunity for positive identification is good" and "the identification has not been weakened by any prior failure to identify but remains even after cross-examination positive and unqualified."[49] Based on this instruction, a reasonable juror could only have concluded that he or she was required to accept Officer Taylor's testimony as true as long as Taylor's identification was positive and consistent. Thus, as long as Officer Taylor's testimony was consistent and he testified he was certain Bey was the shooter, a guilty verdict would necessarily result—regardless of whether the testimony was accurate. The scientific community has understood for decades that eyewitness identifications that are certain and confident are not necessarily accurate.[50] Rather, a witness may honestly hold

---

[46] *Sandstrom v. Montana*, 442 U.S. 510, 523–24 (1979).

[47] *Francis v. Franklin*, 471 U.S. 307, 316 (1985).

[48] *Boyde*, 494 U.S. 370, 378 (1990) (quoting *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

[49] J.A. at 1027.

[50] *See, e.g.*, Nat'l Research Council, Identifying the Culprit: Assessing Eyewitness Identification 31 (2014)

beliefs about what he or she saw that are distorted, inaccurate, or even completely wrong.[51] Accordingly, under established Supreme Court precedent, Bey has a substantial claim that the faulty *Kloiber* instruction deprived him of his due process right to have the prosecution prove every element beyond a reasonable doubt.

Appellees argue that there is no due process problem here because in the context of the instructions as a whole, the jury could not have reasonably believed that it was required to accept Officer Taylor's testimony as true.[52] We realize, of course, that the jury charge included general instructions on evaluating the credibility of witnesses. For example, the jurors were told that they "must consider and weigh the testimony of each witness and give it the weight that you

---

("Research has cast doubt, for instance, on the belief that the apparent certainty displayed in the courtroom by an eyewitness is an indicator of an accurate identification . . . ."); Siegfried Ludwig Sporer et al., *Choosing, Confidence, and Accuracy: A Meta-Analysis of the Confidence–Accuracy Relation in Eyewitness Identification Studies*, 118 Psychol. Bulletin 315, 315–16, 323–24 (1995) (noting that the correlation between accuracy and confidence in eyewitness identifications is "weak at best"); Elizabeth F. Loftus, Eyewitness Testimony 19 (1979) ("[E]yewitness testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all.").

[51] *See* The Innocence Project, Reevaluating Lineups: Why Witnesses Make Mistakes and How to Reduce the Chance of a Misidentification 3 (2009) (estimating that eyewitness misidentifications have been a factor in 75% of the wrongful convictions that were subsequently overturned by DNA evidence); James Michael Lampinen et al., The Psychology of Eyewitness Identification 5 (2012) (explaining that police lineup data shows that eyewitnesses identify a non-suspect as the culprit at least 20% of the time).

[52] Appellees' Br. at 40–42.

think in your own personal judgment it is fairly entitled to receive."[53] Appellees rely on this to argue that the error was harmless. We disagree.

As we have explained: "[W]hile a single defect does not necessarily make an instruction erroneous, . . . other language in the instruction does not always serve to cure the error. This is so even when other language correctly explains the law."[54] Specifically, "a defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts and does not explain the defective language in the instruction."[55] Here, the misstated *Kloiber* instruction that positive eyewitness testimony "may not be received with caution" neither explained nor acknowledged the general instruction that the jury "must consider and weigh the testimony of each witness." Rather, the *Kloiber* instruction directly contradicted the general instruction by instructing the jury *not* to weigh the testimony that was most critical to establishing Bey's guilt. In this context, a jury would have reasonably concluded that positive eyewitness testimony was an exception to the general rule, and that this category of testimony was entitled to special deference if the eyewitness's identification was positive and unqualified. Indeed, such an instruction would be consistent with generally held assumptions that eyewitnesses are accurate and trustworthy.[56]

---

[53] J.A. at 1017–18.

[54] *Whitney*, 280 F.3d at 256 (citing *Francis*, 471 U.S. at 322). *See also Everett*, 290 F.3d at 512 ("The mere fact that the law was correctly stated in one part of the charge will not automatically insulate the charge from a determination of error.").

[55] *Whitney*, 280 F.3d at 256 (citing *Francis*, 471 U.S. at 322).

[56] *See* Timothy P. O'Toole et al., *District of Columbia Public Defender Survey*, Champion, April 2005, at 28–29 (concluding that jurors overestimate eyewitnesses' ability to recall an event despite the limitations of memory and as a result, "jurors often believe mistaken eyewitnesses"); Elizabeth F. Loftus, Eyewitness Testimony 19 (1979) ("All

Clearly, this instruction could be reasonably understood as requiring the jury to accept an eyewitness's identification of Bey as the shooter. Indeed, that was what the jurors were told. We can think of no strategic reason for defense counsel not to object to a charge that raises such due process concerns. Nevertheless, Appellees try to argue that it was strategic and reasonable for Bey's trial counsel not to object to the instruction because Bey's attorney requested the *Kloiber* instruction, and under the circumstances of the case, he was "lucky to have received one."[57] This argument is frivolous. Neither legal authority nor common sense supports an argument that defense counsel would not object to an erroneously-worded charge that raises such grave constitutional concerns merely because the charge was given pursuant to defense request. We therefore conclude that Bey's trial counsel's performance was deficient under *Strickland.*

Bey likewise establishes that he was prejudiced by the instruction. Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[58] A "reasonable probability" is one "sufficient to undermine confidence in the outcome."[59] The prejudice standard "is not a stringent one" and is "less demanding than the preponderance standard."[60] However, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."[61]

---

evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'").

[57] Appellees' Br. at 42.

[58] *Strickland*, 466 U.S. at 694.

[59] *Id.*

[60] *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)).

[61] *Frady*, 456 U.S. at 170.

Appellees argue that because "[t]he eyewitness identification was sure" and the bullets in the victims' bodies matched the gun found at the scene, "the Commonwealth presented an overwhelming case that Bey was guilty," and Bey was not prejudiced by the instruction. We again disagree.

At the first trial, nearly identical evidence resulted in a hung jury. A hung jury can signal that the outcome of a case was close and support a finding that an error on retrial prejudiced a convicted defendant. [62] For example, in *Ouber v. Guarino*, the First Circuit found it significant that "two different [prior] juries found the prosecution's case so evanescent that they were unable to reach a verdict" when analyzing whether counsel's performance prejudiced the defendant in his third trial.[63] Likewise, in *Alston v. Garrison*, the Fourth Circuit noted that "hung juries the first two times [the defendant] was tried" indicated that the prosecution's "evidence [was] not so airtight" and led to the conclusion that "the representation rendered by [the defendant's] court-appointed attorney grossly violated the defendant's sixth amendment rights."[64] Furthermore, in analogous situations, even a single prior hung jury has been deemed sufficient to indicate that the case was close and an error on retrial was not harmless.[65] Here, the fact that Bey's first jury was unable to

---

[62] *E.g.*, *Ouber v. Guarino*, 293 F.3d 19, 33 (1st Cir. 2002); *Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir. 1983).

[63] 293 F.3d at 33.

[64] *Alston*, 720 F.2d at 817.

[65] *United States v. Beckman*, 222 F.3d 512, 525 (8th Cir. 2000) (concluding that failure to admit evidence was not harmless error in part because "when the [previous trial] court allowed the inquiry, a hung jury resulted"); *United States v. Paguio*, 114 F.3d 928, 935 (9th Cir. 1997) ("We cannot characterize the error as harmless, because the hung jury at the first trial persuades us that the case was close and might have turned on this evidence."). *Cf. Breakiron v. Horn*, 642 F.3d 126, 147 n.18 (3d Cir. 2011) ("*Strickland* prejudice and

reach a verdict after hearing Taylor's unequivocal identification strongly suggests that the evidence was not nearly as "overwhelming" as the state would like us to believe.

Furthermore, the jury's deliberations in the second trial also support our conclusion that the second jury did not think this was the "slam dunk" that the state claims. The jury's questions specifically focused on Officer Taylor's testimony. First, the jury asked: "[M]ay we have or hear the transcript of Officer Taylor's testimony describing from the time the officer heard the first shot to when defendant ran west towards the wall[?]"[66] Second, and even more to the essence of the error here, the jury asked: "May we also have [his] statement where Officer Taylor said he saw the defendant shoot Swanson?" Thus, despite arguments to the contrary, Taylor's testimony may well have been a source of concern.

More importantly, it is *because* Taylor's identification appears positive and unequivocal that the *Kloiber* instruction so undermined the integrity of the trial. Taylor's testimony fit into the precise category of evidence that the jury was required to accept. Taylor's testimony was positive: he had a clear view of Bey, making "eye-to-eye" contact with him in the "well lit" parking lot from fifteen feet away.[67] Taylor's testimony was also unqualified: he never wavered in his identification of Bey as the shooter in all of his interviews, preliminary hearings, or in either trial. As a result, to obtain a verdict of guilty the prosecution only needed to show: (1) that Taylor was certain the shooter was Bey; and (2) that Taylor's identification was not otherwise weakened by circumstances such as poor lighting or the inability to see. There was no room for any juror to conclude that Taylor, though certain, was wrong. Accordingly, the prosecution was

_____

*Brecht* harmless error are essentially the same standard." (quoting *Albrecht*, 485 F.3d at 139) (brackets omitted)).
    [66] J.A. at 1041.
    [67] J.A. at 173, 195.

unconstitutionally relieved of its burden of proving that Bey was the shooter beyond a reasonable doubt.

Nor can we say that other evidence presented at Bey's retrial would have resulted in Bey's conviction had the jury been given a correct instruction and chosen to disbelieve Taylor's identification. Indeed, Taylor's identification was the cornerstone of the prosecution's case. All other police officers at the scene believed Bey to be the shooter because Taylor identified him as such. The surviving victim's testimony was inconsistent and unreliable—he testified that he didn't see his shooter, but at other times said his shooter was not Bey. No one but Taylor claimed to see Bey with the weapon that matched the bullets at the scene—the silver 0.380 handgun.

Thus, in light of the importance of Officer Taylor's eyewitness testimony in this case, and the fact that Bey's previous trial resulted in a hung jury, we conclude that Bey was prejudiced because of his trial counsel's failure to object to the faulty *Kloiber* charge. The questions the second jury had about Taylor's testimony also strengthen our conclusion. Therefore, we hold that Bey can show his underlying ineffective assistance of trial counsel claim is a substantial one under *Martinez*.

To excuse his procedural default, *Martinez* also requires that Bey show that his counsel on collateral review rendered ineffective assistance under *Strickland*.[68] As discussed above, in Pennsylvania, it is PCRA counsel's responsibility to raise any ineffective assistance of counsel claims to avoid forfeiting them under state law.[69] Since collateral review with new counsel is the first possible instance in which to raise claims of ineffective assistance of trial counsel, PCRA counsel's failure to raise an

---

[68] *Martinez*, 566 U.S. at 14.
[69] *Grant*, 813 A.2d at 738.

ineffectiveness claim in the initial petition means that "no state court at any level will hear the prisoner's claim."[70]

As we noted above, the three *Kloiber* claims that Bey's PCRA counsel raised failed to include or refer to the language requiring the jury to accept testimony that Bey was the shooter. While we have no record of why PCRA counsel would have chosen to omit an ineffectiveness argument based on the language at issue here, we can think of no strategic reason why counsel would do so, and the state has not offered any viable explanation for such a glaring omission. Accordingly, we agree with Bey that his PCRA counsel's performance was deficient under *Strickland* and that Bey was prejudiced by PCRA counsel's omission. Bey's case, therefore, fits into the narrow category of cases outlined in *Martinez*, and his procedural default is excused as to his ineffectiveness claim based on the faulty *Kloiber* jury instruction.

C

Because Bey has shown cause and prejudice to overcome his procedural default, we now consider the merits of his claim.[71] Given what we have already said, resolution of the merits requires little additional discussion. We need not repeat the numerous reasons why the *Kloiber* jury instruction violated Bey's due process rights. For the same reasons Bey's Sixth Amendment claim is "substantial" under *Martinez*, Bey is able to sustain his burden of showing that his trial counsel's assistance was ineffective for failing to preserve a claim that has obvious merit. Accordingly, we will vacate the District Court's order denying his petition and remand with instructions to issue a conditional writ. Because we grant relief based on Bey's ineffective assistance of counsel claim pertaining to the *Kloiber* issue, we need not consider his

_____

[70] *Martinez*, 566 U.S. at 10.
[71] *Id.* at 17 ("A finding of cause and prejudice . . . . allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.").

ineffectiveness claim based on the prosecution's closing statements.

## III

For the reasons stated above, we will vacate the District Court's order denying habeas relief and remand with instructions for the court to grant a conditional writ of habeas corpus.