PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1391
_____

AARON EDMONDS TYSON,
                    Appellant

v.

SUPERINTENDENT HOUTZDALE SCI;
ATTORNEY GENERAL PENNSYLVANIA
_____

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(D.C. No.: 3-13-cv-02609)
District Judge: Honorable James M. Munley
_____

Argued March 24, 2020

Before: JORDAN, RESTREPO and GREENBERG,
*Circuit Judges*

(Opinion Filed: September 23, 2020)

Michael Wiseman [ARGUED]
Wiseman & Schwartz
718 Arch Street
Suite 702
Philadelphia, PA 19106
          Counsel for Appellant

Andrew M. Kroeckel [ARGUED]
Mark S. Matthews
Monroe County Office of District Attorney
701 Main Street
Second Floor
Stroudsburg, PA 18360
          Counsel for Appellee

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*

Aaron Edmonds Tyson handed his gun to Otis Powell and waited in the getaway car while Powell shot and killed two men in a stopped van. A jury in Monroe County, Pennsylvania, convicted Tyson of two counts of first-degree murder as an accomplice. In seeking post-conviction relief in state court, Tyson claimed his trial counsel was ineffective for not objecting to the court's erroneous instruction, which he argued allowed the jury to find him guilty without finding he possessed the requisite intent to kill. After the state court deemed the claim meritless, Tyson pursued a habeas petition. The District Court held the state court reasonably applied

federal law in finding his trial counsel was not ineffective and denied relief. For the reasons set forth below, we disagree and will reverse the District Court.

## I.      Factual and Procedural Background

The Pennsylvania Superior Court summarized the facts of this case as follows:

> On April 24, 2002, [Tyson], [Powell] and Kasine George ("George") were riding in a vehicle. At some point, [Tyson] exited the car and, when he returned, stated that two white boys had just pulled a gun on him. George described [Tyson] as angry at that time. [Tyson], who was at that point a passenger in the car, took a 9 millimeter handgun from the center console. He racked the slide of the gun, thus arming it. [Tyson] told Powell, who was driving, to pull out from the location where the vehicle was parked.
>
> [Tyson] pointed to a van and indicated it was being driven by the two who had pulled a gun on him. With Powell driving, the three followed the van to a club. When the two white men entered that club, Powell gave George a knife, directing him to puncture the tires on the van. George did so to at least one of the tires. When George returned to the car, [Tyson] was in the driver's seat. Powell was now a passenger and he asked [Tyson] for the gun. After five or ten minutes, the two white men exited the bar, entered the van and left the location.

3

> With [Tyson] now driving, the three again followed the van. It eventually stopped due to the flat tire. At that point, [Tyson] and his two companions were going to exit the car, but Powell told the other two to wait. Powell then walked to the van. As he did so, [Tyson] backed the car to a point where he and George could see what was transpiring at the van. At that point, Powell shot its two occupants, Daniel and Keith Fotiathis. . .. He then ran back to the car. Powell, George and [Tyson] left the scene. [Tyson] drove the vehicle. The three discussed whether they should go to New York but eventually decided to return to their nearby home.

*Commonwealth v. Tyson*, 947 A.2d 834 (Pa. Super. 2008) (unpublished memorandum) at 6-8, *appeal denied*, 605 Pa. 686, 989 A.2d 917 (Pa. 2009).

Brothers Daniel and Keith Fotiathis died from the gunshot wounds inflicted by Powell. Tyson was charged with being an accomplice to two counts of first and third-degree murder and tried by jury in May of 2006. Kasine George, who was later arrested on unrelated drug charges, provided information to the police and testified for the Commonwealth at trial. Tyson was found guilty as an accomplice to the first-degree murders of the Fotiathis brothers. In July 2006, the trial court sentenced him to the mandatory term of life imprisonment without parole.

Under Pennsylvania law, the specific intent to kill is an element of first-degree murder. *Commonwealth v. Thomas*, 194 A.3d 159, 167 (Pa. Sup. Ct. 2018). To be guilty as an accomplice in Pennsylvania, a person must act with the same

4

intention of promoting or facilitating the crime as the principal. 18 Pa.C.S. § 306(c), (d). Thus, to be guilty as an accomplice to first-degree murder, the state must prove the accused possessed the specific intent to kill. *Commonwealth v. Speight*, 854 A.2d 450, 460 (Pa. 2004). *See also Everett v. Beard*, 290 F.3d 500, 513 (3d Cir. 2002) ("Pennsylvania law has clearly required that for an accomplice to be found guilty of first-degree murder, s/he must have intended that the victim be killed.") (*abrogated on other grounds, Porter v. McCollum*, 558 U.S. 30, 130 (2009)).

At trial, the Commonwealth's theory of the case was that Tyson was guilty because he assisted the principal, Powell. In his closing argument, the prosecutor stated that the "rule" in Pennsylvania is "if you help a shooter kill, you are as guilty as a shooter." A-885. He expounded on this statement with an analogy:

> So in a bank robbery, when there's a look out sitting outside the bank and he tells his friends who are armed now, don't go shooting any bank guards. Go and get the money and come back out. And I am going to stay in the car and we will drive off and live happily ever after. And the two friends go in a shoot a bank guard. Guess what? He is as guilty as they are even though he told them not to shoot because the law can sometimes be sensible, especially with a criminal.

A-885-86. The prosecutor concluded the explanation by stating that "anyone who is with the shooter . . . either helped to drive a vehicle, providing the vehicle, handing the gun over, slashing the tire, any of those acts make those people equally

5

guilty of the criminal offense as a helper, as an accomplice. That is beyond any doubt whatsoever." A-886.

The Commonwealth's explanation of accomplice liability was a misstatement of Pennsylvania law. The court's jury instruction reinforced this misstatement and similarly failed to convey that an accomplice to first-degree murder must possess the intent to kill. After emphasizing that Tyson was charged as an accomplice, not the principal, the court defined both first and third-degree murder by focusing entirely on the mental state of "the killer." A-926. In explaining the elements of first-degree murder, the court mistakenly identified Powell as the accomplice and told the jury he committed an intentional killing, stating that "in this case – not this Defendant – but Otis Powell killed them as an accomplice with the Defendant, Aaron Tyson. And this was done with the specific intent to kill." A-927. The instruction was further marred by the court mistakenly naming the elements of first-degree murder as the elements of third-degree murder.

The court's instruction for accomplice liability was general and not tied to either murder charge. Instead, the court explained that Tyson "is an accomplice if with *the intent to promote or facilitate the commission of a crime* he encourages, requests or commands the other person to commit it or agrees or aids or agrees to aid or attempts to aid the other person in planning, organizing, committing it." A-930 (emphasis added). The court finished its explanation with a circular statement: "You may find [Tyson] guilty on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed; that [Tyson] was an accomplice of the person who actually committed the crime." A-930. The court failed to mention that, under Pennsylvania

6

law, an accomplice to first-degree murder must intend to promote or facilitate a killing.

After the instruction concluded, the court entertained the jury's request for clarification on the degrees of murder. It reiterated the elements of first and third-degree murder, this time correctly, but again focused entirely on the intent of the "killer" without citing the requisite *mens rea* of the accomplice. A-948. It then practically directed the jury to find for first-degree murder because, "in this particular case," the charge of being an accomplice "almost by definition . . . encompasses the concept of first degree murder," while the charge of accomplice to third-degree murder is "offered as another possibility even though it does not fit as well within the confines of the explanation because counsel agreed you may consider that as a possibility." A-950-51.[1]

Tyson appealed to the Pennsylvania Superior Court, raising numerous claims not relevant to this appeal, and the court affirmed his conviction of two counts of accomplice to first-degree murder. In November 2010, Tyson filed a timely *pro se* petition and accompanying brief in accordance with the Post-Conviction Relief Act (PCRA) before the trial court. In his petition, Tyson stated he was "deprived of his Constitutional Rights to Due Process and right to effective assistance of counsel." A-172. In the accompanying brief, Tyson articulated that Pennsylvania law requires proof that an accomplice to first-degree murder possess the specific intent to the kill. A-178. He alleged that the trial court's instruction did

---

[1] The jury was instructed on third-degree murder after the court suggested to defense counsel that such an instruction would be appropriate. A-916-17.

not convey this burden of proof to the jury, in violation of his due process rights under federal law. A-179.

Counsel was appointed and filed an amended PCRA petition, which expounded upon Tyson's claim that, based on federal law, trial counsel was ineffective for failing to object to the trial court's instruction. PCRA counsel argued an objection was warranted because "[t]he instruction as given could easily have confused the jury as to what kind of intent must be shown beyond a reasonable doubt." A-182.

A PCRA hearing was held before the trial court in October 2011. Tyson's post-conviction counsel questioned trial counsel about his failure to object to the accomplice instruction; trial counsel responded that he did not remember the charge. A-973. In subsequent briefing, post-conviction counsel reiterated the ineffective assistance claim, arguing that trial counsel's failure to request an instruction on the *mens rea* required for accomplice liability "is a tremendously important point" because the intent to kill "means the difference between murder in the first degree and murder in the third degree." A-188.

The trial court denied Tyson's PCRA petition finding that, *inter alia*, counsel was not ineffective for failing to object to the jury instruction because it provided a definition of accomplice liability and the elements of first-degree murder. Citing portions of the instruction, the court concluded that, on the whole, it conveyed the Commonwealth's burden to prove beyond a reasonable doubt that Tyson possessed "the shared specific intent to kill the Fotiathis brothers." A-151. The court bolstered the denial of the ineffectiveness claim by stating that the evidence presented to the jury "revealed that [Tyson's] conduct was willful, deliberate and premeditated and that he

actively participated in the murders by aiding the shooter." A-151.

Tyson appealed to the Pennsylvania Superior Court, which affirmed the findings of the trial court and denied post-conviction relief. Adopting the "cogent" reasoning of the lower court, the Superior Court agreed that the ineffective assistance claim was meritless because the instruction sufficiently conveyed the requisite *mens rea* for an accomplice to first-degree murder. A-052. It affirmed the trial court's denial of PCRA relief.

In October 2013, Tyson filed a *pro se* writ of habeas corpus in the Middle District of Pennsylvania raising four claims of ineffective assistance of counsel.[2] In deciding the instant claim regarding counsel's failure to object to the accomplice liability instruction, the District Court found that the Pennsylvania Superior Court assessed the claim on its merits and it had therefore been exhausted in state courts. Accordingly, the District Court applied the standard of review of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), and concluded that the Superior Court reasonably applied clearly established federal law in determining that Tyson's trial counsel was not

---

[2] The District Court stayed Tyson's habeas petition so that he could pursue his second and third PCRA petitions in state court, both of which were denied by the PCRA court as untimely. The Superior Court affirmed both denials. After the denial of the third petition, the Pennsylvania Supreme Court denied leave to appeal.

9

ineffective for failing to object to the accomplice liability instruction. A-12-13.

Tyson appealed to this Court, which granted a certificate of appealability limited to "his jury instructions claim under both the Fourteenth Amendment's Due Process Clause, see Estelle v. McGuire, 502 U.S. 62, 72 (1991), and the Sixth Amendment, see Strickland v. Washington, 466 U.S. 668, 687 (1984)." A-23. As per the certificate's instruction, the parties addressed the District Court's determination that the ineffective assistance of counsel claim had been exhausted in state court and was not procedurally defaulted. A-22-23.

## II.     Exhaustion and Procedural Default

Under AEDPA, a federal court may grant habeas corpus relief if it concludes the petitioner is in custody in violation "of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioners in state custody may bring a habeas petition only if they have properly exhausted the remedies available in state court, assuming such remedies are available and can effectively redress the petitioner's rights. 28 U.S.C. § 2254(b)(1)(A). Exhaustion requires a petitioner to "fairly present" their federal claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Robinson v. Beard*, 762 F.3d 316, 328 (3d Cir. 2014). Because Pennsylvania law prevents a defendant from raising an ineffective assistance of counsel claim on direct appeal, *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002), a defendant exhausts an ineffective assistance of counsel claim in the Commonwealth by raising it in the first petition for collateral relief under the PCRA, *see Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236-37 (3d Cir. 2017).

10

In his *pro se* PCRA petition, Tyson asserted that his counsel was ineffective for failing to object to the trial court's erroneous instruction, which violated his due process rights under the Fourteenth Amendment. He cited both this Court's decision in *Laird v. Horn*, 414 F.3d 419, 430 (3d Cir 2004), which held that an instruction that failed to explain that an accomplice to first-degree murder must possess the intent to kill violated the accused's due process rights, and the Pennsylvania Supreme Court's decision in *Commonwealth v. Huffman,* 638 A.2d 961 (Pa. 1994), which held that the specific intent to kill is an element of the crime of accomplice to first-degree murder that must be proven beyond a reasonable doubt in accordance with the Supreme Court's decision *In re Winship*, 397 U.S. 358 (1970).

Tyson's *pro se* pleading, which was later utilized in his counseled petition, was sufficient to fairly present his federal ineffective assistance of counsel claim to the state court. *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) ("To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted. … Yet, the petitioner need not have cited 'book and verse' of the federal constitution.")[3]

---

[3] Upon denial of his claim by the Superior Court, Tyson was not required to seek review in the Pennsylvania Supreme Court in order to exhaust his claim. *See Pennsylvania Bulletin: Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases*, 30 Pa. Bull. 2582 (2000) (stating effective immediately, following adverse order from Superior Court or Supreme Court of Pennsylvania, petition for rehearing or allowance of appeal no longer required in post-conviction

The Commonwealth contests this conclusion, arguing that both the underlying due process claim and the ineffective assistance claim must be exhausted before this Court can conduct habeas review.[4] It maintains that Tyson's due process challenge was not fairly presented to the state court because it was not raised on direct appeal. Because the claim would be deemed waived under Pennsylvania law, the Commonwealth argues the doctrine of procedural default prohibits this Court from addressing the alleged due process violation on habeas review.

We disagree that the due process claim can be regarded as separate and distinct from the ineffective assistance of counsel claim. Addressing the claims independently of one another would require us to disregard the analysis conducted

relief matters to exhaust state court remedies for purposes of federal habeas proceedings).

[4] "The doctrine of procedural default prohibits federal courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment." *Fahy v. Horn*, 516 F.3d 169, 187 (3d Cir. 2008). "A state procedural rule is 'adequate' if it was firmly established and regularly followed' at the time of the alleged procedural default." *Bey*, 856 F.3d at 236 n.18 (quoting *Ford v. George*, 498 U.S. 411, 424 (1991)). Here, the Commonwealth argues the due process claim was procedurally defaulted because a rule of Pennsylvania law would deem it waived on post-conviction review. For the reasons explained above, this argument is unpersuasive because the due process claim was raised within the ineffective assistance claim, which a rule of Pennsylvania law found cognizable.

by the state court.  Moreover, because Tyson did not raise the due process claim on direct appeal, it is only cognizable under Pennsylvania law through the lens of an ineffective assistance claim on post-conviction review.  The Superior Court held Tyson's trial counsel was not ineffective for failing to object to the court's instruction because the instruction did not violate Tyson's due process rights.  Applying the proper standard of review under AEDPA, the District Court concluded the Superior Court's determination constituted a reasonable application of clearly established federal law as announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  It is this conclusion we now review on appeal.

## III.    Standard of Review

In denying habeas relief, the District Court did not hold an evidentiary hearing nor engage in independent fact-finding.  Accordingly, "we apply de novo review to its factual inferences drawn from the state court record and its legal conclusions." *Mathias v. Superintendent Frackville SCI,* 876 F.3d 462, 475 (3d Cir. 2017).

Because we have concluded the state court decided Tyson's ineffective assistance claim on its merits, we review it in accordance 28 U.S.C. § 2254, as amended by AEPDA.[5]

---

[5] We recognize, in affirming this finding by the District Court, that there is a presumption that the state court adjudicated a claim on the merits "in the absence of any indication or state-law procedural principals to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  The presumption holds even if the state court did not analyze or even cite Supreme Court decisions in reaching its conclusion.  Even "[w]here a state court's decision is unaccompanied by an explanation," the

13

Section 2254(d) provides this Court with the statutory authority to grant habeas corpus relief for petitioners in state custody, stating:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

We are concerned here with whether the Pennsylvania courts' application of clearly established federal law was unreasonable. That is an objective inquiry. *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). Under AEDPA review, "a habeas court must determine what arguments or

_____

habeas petitioner has the burden of proving the state court's denial of relief was the result of an unreasonable legal or factual conclusion. *Id.* at 98.

14

theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102.

Here, the Superior Court found that Tyson's trial counsel was not ineffective. In so doing, it applied Pennsylvania Supreme Court law that counsel is presumed effective unless the appellant proves: 1) the underlying claim has arguable merit; 2) counsel's course of conduct "did not have some reasonable basis designed to effectuate [the appellant's] interests;" and, 3) "but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different." *Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003); A-48.

This Court has repeatedly recognized that Pennsylvania's test for ineffective assistance of counsel is consistent with the Supreme Court's decision in *Strickland* because it requires "findings as to both deficient performance and actual prejudice." *Mathias*, 876 F.3d at 476. *See also Jacobs v. Horn,* 395 F.3d 92, 106 n.9 (3d Cir. 2005); *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). Here, the Superior Court found the court's jury instruction sufficiently conveyed the Commonwealth's burden to prove Tyson possessed the intent to kill. Because the underlying due process claim was deemed to have no arguable merit, the court held counsel could not be ineffective for not objecting to the instruction. The District Court found this decision constituted a reasonable application of *Strickland*. We disagree.

15

## IV. Ineffective Assistance of Counsel.

### A. Counsel's Performance

We begin our analysis with the first prong of *Strickland*, examining whether the Superior Court's decision that counsel acted reasonably was contrary to clearly established federal law. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). To obtain relief, Tyson must prove the alleged errors were "so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Generally, trial counsel's stewardship is constitutionally deficient if he or she 'neglect[s] to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority' unless the failure is a strategic choice." *Bey*, 856 F.3d at 238 (quoting *Everett*, 290 F.3d at 514).

We recognize that "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one" and that, under AEDPA review, that deference is heightened. *Harrington*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. *See Burt v. Titlow*, 571 U.S. 12, 15 (2013) ("When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel …, our cases require that the federal court use a 'doubly deferential' standard of review that gives both the state court and the

16

defense attorney the benefit of the doubt." (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

Tyson argues that counsel's inaction permitted the court to instruct the jury that they could convict him of first-degree murder as an accomplice without finding he possessed a specific intent to kill – in effect, allowing the Commonwealth to not prove an element of the crime. The Due Process Clause of the Fourteenth Amendment requires the government to prove each element of an offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). "This bedrock, 'axiomatic and elementary' principle" prohibits a jury instruction that lessens the prosecution's burden of proof. *Francis v. Franklin*, 471 U.S. 307, 313 (1985) (quoting *In re Winship*, 397 U.S. at 363). If the instruction contains "some 'ambiguity, inconsistency, or deficiency,'" such that it creates a "reasonable likelihood" the jury misapplied the law and relieved the government of its burden of proving each element beyond a reasonable doubt, the resulting criminal conviction violates the defendant's Constitutional right to due process. *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 285 (3d Cir. 2018) (citing *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal citations omitted)).

When a habeas petitioner claims the jury instruction was unconstitutional, "we have an independent duty to ascertain how a reasonable jury would have interpreted the instructions at issue." *Smith v. Horn*, 120 F.3d 400, 413 (3d Cir. 1997) (citing *Francis*, 471 U.S. at 315-16). We exercise this duty by "focus[ing] initially on the specific language challenged," *Francis*, 471 U.S. at 315, and then considering the "allegedly constitutionally infirm language . . . in the context of the charge as a whole" to determine whether there is a reasonable likelihood the jury applied the instructions in a

17

manner violative of the accused's due process rights. *Smith*, 120 F.3d at 411.

Reading the instant instruction through this lens, we find a strong likelihood the jury convicted Tyson as an accomplice to first-degree murder without finding he possessed the specific intent to kill. Indeed, we could find no language in the instruction that would lead the jury to connect the requisite intent to kill to the role of an accomplice.

The instruction began with the court's definition of malice, the *mens rea* element for murder, as encompassing "one of three possible mental states which the law regards as being bad enough to make a killing a murder." A-926. It instructed the jury to find malice "*if the killer acts* with the intent to kill, or secondly, with an intent to inflict serious bodily harm, or third, [with] that wickedness of disposition . . .." A-926 (emphasis added). The instruction therefore conveyed to the jury that the only relevant mental state was that of the killer; it neither referenced nor explained the requisite mental state of an accomplice.

The court next provided confusing definitions of the different degrees of murder, initially identifying the elements of first-degree as third-degree murder. From there, the instruction affirmatively informed the jury that Powell – whom it mistakenly identified as an accomplice – possessed the intent to kill:

> With third degree murder the elements of the offense . . . that the Commonwealth must prove is that Daniel and Keith Fotiathis are dead – and I think there's not a question that they are dead. . . . Secondly, that in this case – not this Defendant

18

> *– but Otis Powell killed them as an accomplice with the Defendant, Aaron Tyson. And this was done with [the] specific intent to kill.* Malice. Specifically, specific intent to kill is a fully-formed intent to kill. And one who does so is conscious of having that intention. But also a killing with specific intent is killing with malice. *If someone kills in that manner that is willful, deliberate [and] premeditated like in this case* stalking or lying in wait or ambush, that would establish specific intent.

A-927 (emphasis added). Defense counsel did not object to the court's mistake as to the degree of murder, which likely confused the jury but arguably did not prejudice Tyson. The absence of an objection to the court's explanation of the *mens rea* element of first-degree murder, however, is indefensible. The court inadvertently identified the actual shooter as an accomplice, and then informed the jury the facts of record established the killings were intentional. The instruction comes close to identifying Tyson, who the court had already identified as the alleged accomplice, as presumptively guilty of first-degree murder. The court in no way conveyed the Commonwealth's burden to prove that Tyson acted with the specific intent to kill. It instead conveyed to the jury that Powell's presumed intent to kill would render Tyson guilty as an accomplice to first-degree murder.

The court's instruction on third-degree murder led the jury further astray:

> In third degree murder the killer must again act in such a manner that there is malice [and] that the person who is the victim must be dead. *And,*

19

> *again, the connection with the person who did
> the killing is such that there has to be a direct
> connection.* Remember what I said about
> malice? . . . It is a shorthand way of referring to
> three different *possible mental states that the
> killer may have* that the law would regard making
> a killing a murder.

A-927 (emphasis added). As with the instruction on first-degree murder, the court identified the requisite intent of "the killer" without mentioning the *mens rea* of the accomplice. The circuitous reference to an accomplice as someone with a "connection with the person who did the killing" implies guilt so long as the connection is "direct." But a "direct connection" does nothing to convey that Tyson and "the killer" must each have had a specific intent to commit murder. Instead both instructions imply the jury must only determine Powell's state of mind in determining Tyson's guilt as an accomplice.

The court's instruction on accomplice liability only made it more likely that a reasonable juror would misapprehend the law. Rather than convey the crucial point that an accomplice must intend to kill to be guilty of first-degree murder, the court's explanation was general and defined an accomplice as one who intends to promote or facilitate "a crime:"

> You may find the defendant guilty of the crime
> without finding that he personally performed the
> acts required for the commission of that crime.
> The Defendant is guilty of a crime if he is an
> accomplice of another person who commits the
> crime. He is an accomplice if with the *intent to
> promote or facilitate the commission of a crime*

20

he encourages, requests or commands the other person to commit it or agrees or aids or agrees to aid or attempts to aid the other person in planning, organizing, committing it.

*You may find the Defendant guilty of a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed; that the Defendant was an accomplice of the person who actually committed the crime.*

A-930 (emphasis added).[6]  Tyson argues that this general instruction on accomplice liability directs the jury to find him

---

[6] This instruction is substantially different than the current Pennsylvania Suggested Standard Criminal Jury Instructions for accomplice liability for the crime of first-degree murder, which reads:

> A person can also be guilty of first-degree murder when he or she did not cause the death personally when the Commonwealth proves beyond a reasonable doubt that he or she was an accomplice in the murder. To be an accomplice in a murder, the defendant must have himself or herself intended that a first-degree murder occur and the defendant then [[solicits] [commands] [encourages] [[[[[[[requests] the other person to commit it] [or] [[aids] [agrees to aid] [[[[or] [[[[[attempts to aid] the other person in planning or committing it].

PA-JICRIM 8.306(B)(4). In the accompanying note, the committee recognizes that accomplice liability "is offense specific," meaning that guilt attaches to the charge if the

21

guilty of first-degree murder if he intended to assist with the commission of *any* crime. He contends a reasonable juror could have interpreted this instruction to mean Tyson was guilty as an accomplice if he intended to confront the victims, but not kill them, or intended to enable a separate crime, such as Powell's illegal possession of a firearm or threatening the victims with a crime of violence.

We agree. This Court has previously held that, when a specific intent instruction is required, a general accomplice instruction lessens the state's burden of proof and is therefore violative of due process. *Smith,* 120 F.3d at 412-14. As with the instruction in *Smith*, the trial court here did not identify the crime to which accomplice liability should attach; nothing in the charge tied the mental state of an accomplice to that of a murderer. The result was an implication that if Tyson was an accomplice to "a" crime, he was an accomplice to any crime also committed, including first-degree murder. *Smith*, 120 F.3d at 414 (instruction violative of due process because it was reasonably likely jurors convicted Smith of first-degree murder based on the finding that he was an accomplice to robbery).[7]

accomplice had the intent to assist in the commission of the specific offense. *See note,* PA-JICRIM 8.306(a).

[7] Tyson argues the instruction created a "strong likelihood" that the jury believed "his life as a drug dealer" constituted "a crime" with regard to his accomplice liability. Appellant's Br., 26. However, the court instructed the jury not to infer guilt from evidence of his drug dealing. It directed jurors to find Tyson guilty if they believe "he did, in fact, act as accomplice in the death of Keith and Daniel Fotiathis and not because [they] believe he is convicted [of] or committed these drug

After the instruction concluded, the jury understandably requested the court to clarify the difference between first and third-degree murder. In response to this request, the court reinforced the inference that Tyson's *mens rea* was not relevant in deciding his guilt:

> First degree murder is when a killer has a specific intent to kill. And there are three elements. The first is that Keith and Daniel Fotiathis are dead. . . . *And the second is that the killer actually killed them. That would not be Mr. Tyson. But the killer actually killed these people*. Mr. Tyson is an accomplice, is what the Commonwealth charges. And, thirdly, that these killings were accomplished with a specific intent to kill and with malice.

A-948-49 (emphasis added). The court distinguished Tyson's role from that of "the killer" but omitted the requirement that the jury find beyond a reasonable doubt that Tyson intended for the Fotiathis brothers to be killed. The instruction repeatedly and consistently instructed that the only relevant inquiry is whether "the killer" acted with specific intent. It stated that "[a]ll that is necessary is they have enough time so the killer does actually form the intent to kill;" and "[y]ou can infer [the specific intent to kill] from the evidence if you find the killer used a deadly weapon in this case." A-950. The

---

offenses." A-944. The jury is presumed to follow a court's instruction and we therefore conclude the jury did not find him guilty due to evidence of his drug dealing. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

instruction altogether eliminated the *mens rea* element of accomplice liability for first-degree murder.

Finally, the trial court ended its clarification by discouraging the jury against finding that the double shooting constituted the lesser offense of third-degree murder:

> *In this particular case because there is a charge of an accomplice almost by definition it encompasses the concept of first-degree murder* by its very definition, an accomplice with the planning and the coordination if you, in fact, found to be so indicate [sic] that was first degree murder. *But third-degree murder offered as another possibility even does not fit well within the confines of the explanation* because counsel agreed you may consider that a possibility.

A-950-51 (emphasis added). There is a reasonable likelihood the jury understood this passage as a strong suggestion by the court to convict Tyson of first-degree murder, and that finding him guilty of third-degree murder would be inappropriate. The court ostensibly urged the jury to find Tyson guilty as an accomplice to first-degree murder because it believed the facts supported such a verdict.

We have not found, and the Commonwealth has not provided, a portion of the charge that corrects these consistent misrepresentations of the law. The instruction conveyed that Tyson's guilt as an accomplice hinged upon the principal's mental state until it finally "removed the discretion that the jury could have otherwise exercised" and directed it to find Tyson guilty as an accomplice to first-degree murder. *Bey*, 856 F.3d at 239. Because the instruction eradicated the prosecution's

burden to prove the *mens rea* element of an intentional killing, it plainly violated Tyson's due process rights.

In light of the instruction's profound impropriety, we conclude that trial counsel acted unreasonably in failing to object. The failure to object was particularly glaring given that the prosecutor's closing argument contained the same erroneous interpretation of Pennsylvania law. The prosecutor told the jury that "whoever was involved in this shooting is a murderer. Either the shooter, or any helper, who under Pennsylvania law, is an accomplice." A-885. Through the analogy of the look-out who told his co-conspirators not to shoot the bank guards but was still guilty of the bank guard's murder, the prosecutor informed the jury that a "helper" *who plainly did not possess the intent to kill* was guilty of murder as an accomplice. Although the counsel's arguments "'carry less weight with the jury' than the trial court's instructions," the Commonwealth's blatant misstatement of the law certainly "increased the likelihood that the jury interpreted the charge so as to relieve the Commonwealth of its burden of proof." *Bennett*, 886 F.3d at 287-88 (citing *Sarausad*, 555 U.S. at 195) (internal citations omitted).[8]

---

[8] The prosecutor's argument confounded general accomplice liability with accomplice liability. To be guilty as an accomplice under Pennsylvania law, there must be evidence that the defendant intended to aid or promote the underlying offense, and that the defendant actively participated in the crime by "soliciting, aiding, or agreeing to aid the principal." *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004). To be guilty as a co-conspirator, a defendant must enter into an agreement with another to engage in the crime, and he or a co-conspirator must commit an "overt act" in furtherance of the

25

Despite the absence of any instruction directing the jury to find an essential element of an offense defined by Pennsylvania law, the Superior Court held the trial court's charge did not warrant counsel's objection. We conclude that this holding constitutes an unreasonable application of *Strickland*. While we recognize there are "countless ways to provide effective assistance in any given case," we cannot fathom a strategic reason for counsel's failure to object to an instruction that eliminates the state's burden to prove an element of a crime that carries a mandatory sentence of life imprisonment. *Strickland*, 466 U.S. at 689. Even if we "evaluate the conduct from counsel's perspective at the time," we hold his inaction constituted a serious enough error that his representation fell outside the "'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). Given the nature and circumstances of this particular instruction, the state court's finding to the contrary constitutes an unreasonable application of clearly established law.

---

crime. *Id*. at 1238 (citing 18 Pa.C.S. § 903). If a different crime is committed in furtherance of the agreed-upon crime – for example, if a bank guard is killed while the agreed-upon bank robbery is underway -- a co-conspirator is liable for the murder. *See Commonwealth v. Strantz*, 195 A. 75, 79 (1937). An accomplice in the same circumstance, however, is guilty of murder only if he intended to aid or promote the shooting of the bank guard and had the same kind of culpability as the principal. *See* 18 Pa.C.S. § 306(c)(1) & (d).

### B. Prejudice

We now turn to *Strickland*'s prejudice prong. To establish prejudice, Tyson must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Here, the Pennsylvania Superior Court did not assess whether Tyson suffered prejudice because it found counsel's performance reasonable. Tyson, as a habeas petitioner, must nonetheless meet his burden under AEDPA review of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98; *see also id.* (AEDPA review "applies when a 'claim,' not a component of one, has been adjudicated."). The question is not whether a finding of no prejudice would have been incorrect, it is whether such a decision would have been unreasonable, which is "a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

We have already concluded that counsel's failure to object to the court's instruction led to the likelihood that the jury interpreted the law in a way that lessened the Commonwealth's burden of proof. Tyson appears to argue that reaching this conclusion is enough to establish prejudice. But AEDPA review demands a more comprehensive analysis to determine whether it would be unreasonable to find the

instruction did not render Tyson's conviction unfair. *Harrington*, 562 U.S. at 111-12. We therefore look to the record to determine whether the instruction interfered with the jury's assessment of the evidence to the extent that, but for the incorrect statements of law, there is a substantial likelihood that a different verdict would have been reached. *Id*. at 112.

In denying relief, the Superior Court adopted the PCRA court's characterization of the evidence as "reveal[ing] that [Tyson's] conduct was willful, deliberate and premeditated and that he actively participated in the murders by aiding the shooter." A-51. While the state courts correctly recognized Tyson's intent to kill could be proven through circumstantial evidence, they ignored circumstantial evidence that could have supported the opposite conclusion. Kasine George, the only eyewitness to testify, stated that Tyson handed his gun to Powell at Powell's request as they followed the Fotiathis brothers' van. Once the van stopped, Tyson stopped the car in a nearby alley and Powell exited the car with the gun. When George and Tyson started to join him, Powell stopped them and told them to wait in the car. Rather than accompany Powell, George and Tyson stayed behind while Powell went alone and shot the victims. George testified that he anticipated a confrontation, but that neither Tyson nor Powell discussed any intention to kill the Fotiathis brothers. George stated that, while following behind the disabled van, they never discussed a plan for when they eventually caught up with and encountered the victims. From this account, a jury could have reasonably concluded that Tyson, like George, anticipated a

28

confrontation of some kind but that Powell alone possessed the intent to kill.[9]

At trial, counsel recognized the absence of any concrete evidence of Tyson's intention to commit murder. In moving for a judgment of acquittal on the accomplice to first-degree murder charge, counsel argued that George's testimony failed to establish "any express or real implied agreement" that the men were "going to, in fact, kill the Fotiathis brothers." A-849. The trial court denied the motion, finding that an intent to kill could be inferred by the circumstances.[10] In light of this exchange, counsel's failure to object to the instruction, which did not require the jury to find *any* agreement to kill, is inexplicable. Had counsel requested the court include the *mens rea* element of accomplice liability in its instruction, there is a substantial probability that the jury could have found that Tyson lacked the intent to kill. *Strickland*, 466 U.S. at 693-6. Because the deficient instruction hindered the jury's assessment of important circumstantial evidence, it would be unreasonable to conclude that Tyson was not prejudiced by counsel's failure to object. *See, e.g., Bey*, 856 F.3d at 244 (finding that Bey was prejudiced by counsel's failure to object to a deficient instruction).

---

[9] The lead detective on the case, Detective Richard Wolbert, stated that Kasine George provided the "best information" regarding Tyson's role in the shooting. A-823.

[10] In denying the motion, the court acknowledged George's testimony that Tyson gave his gun to Powell prior to the shooting. The trial court, in rejecting counsel's argument that there was no agreement as to what to do with the gun, replied, "[t]hey were not deer hunting." A-0850.

29

This case is distinguishable from our decision in *Mathias*, which held a state court's denial of an ineffective assistance claim arising from an alleged erroneous instruction was reasonable under AEDPA review. The instruction in *Mathias*, which the petitioner claimed allowed him to be convicted of first-degree murder without a finding of specific intent, made inconsistent statements regarding accomplice liability, with some portions properly instructing jurors to find shared intent and others incorrectly implying the principal's intent to kill was grounds for convicting the accomplice. *Mathias*, 876 F.3d at 467, 478. Reading the instruction as a whole, the state court concluded that Mathias' due process claim would not have succeeded on appeal because portions of the instruction "properly articulated the specific intent requirement." *Id.* at 478-79. In reviewing this decision under AEDPA, the *Mathias* Court found that "tension between" Supreme Court decisions addressing "ambiguous" jury instructions meant the denial of the ineffective assistance claim did not constitute an unreasonable application of *Strickland*. *Id.* at 478 -9.

Here, we find no such tension in federal law that would allow the Superior Court's denial of Tyson's claim to withstand even AEDPA's deferential review. The instruction was not ambiguous. It instead provided a consistently incorrect statement of the law that in effect absolved the prosecution from having to prove a key element of the status of an accomplice to first-degree murder. Unlike the instruction in *Mathias*, no portion of the instruction articulated the correct *mens rea*. The Commonwealth cited the instruction at length and stated that accomplice liability instruction was rooted "within [the] context of the actual charge of first-degree murder." Br. Appellee, 14. The plain text of the instruction,

30

however, shows that the charge of first-degree murder did not articulate the intent requirement of the accomplice. Given the likelihood that the jury here convicted Tyson on the mistaken belief that the *mens rea* for first-degree murder did not apply to him, we cannot find the conclusory reasoning of the state court amounted to a reasonable application of *Strickland.*

## IV.    Conclusion

Because the court's instruction did not require the Commonwealth to meet its burden of proof, we find counsel's failure to object constituted deficient representation. Tyson established prejudice because there is a reasonable probability that, but for his counsel's inaction, he would not have been convicted as an accomplice to first-degree murder and sentenced to life in prison. The profound errors in the instruction were compounded by the prosecutor's misguided closing argument and the inconclusive circumstantial evidence presented to the jury, rendering the state court's finding that counsel was not ineffective to be an unreasonable application of *Strickland*.

We will therefore reverse the District Court's order denying habeas corpus relief and remand with instructions to grant a conditional writ of habeas corpus regarding Tyson's conviction for accomplice to first-degree murder so that the matter may be remanded to state court for further proceedings consistent with this opinion.